# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| THOMAS KEON MCCONNELL, | Case No. |
| Plaintiff, | **COMPLAINT AND JURY TRIAL DEMAND** |
| v. | |
| EXPERIAN INFORMATION SOLUTIONS, INC., EQUIFAX INFORMATION SERVICES, LLC, TRANS UNION LLC, IQ DATA INTERNATIONAL, INC., | |
| Defendants. | |

## <u>COMPLAINT</u>

Thomas Keon McConnell ("Plaintiff"), by and through the undersigned counsel, brings this action on an individual basis, against Equifax Information Services, LLC ("Equifax"); Experian Information Solutions, Inc. ("Experian"); Trans Union LLC ("Trans Union") (collectively, the "Credit Bureau Defendants"); and IQ Data International, Inc. ("IQ Data"); (all defendants collectively, "Defendants"), and states as follows:

## INTRODUCTION

1.     The computerization of our society has resulted in a revolutionary increase in the accumulation and processing of data concerning individual American consumers. Data technology, whether it is used by businesses, banks, the Internal Revenue Service or other institutions, allows information concerning individual consumers to flow instantaneously to requesting parties. Such timely information is intended to lead to faster and better decision-making by its recipients and, in theory, all of society should ultimately benefit from the resulting convenience and efficiency.

2.     However, unfortunately this information has also become readily available for, and subject to, mishandling and misuse. Individual consumers can and do sustain substantial damage, both economically and emotionally, whenever inaccurate or fraudulent information is disseminated and/or obtained about them. In fact, the Credit Bureau Defendants acknowledge this potential for misuse and resulting damage every time they sell their respective credit monitoring services to a consumer.

3.     The ongoing technological advances in the area of data processing have resulted in a boon for the companies that accumulate and sell data concerning

individuals' credit histories and other personal information. Such companies are commonly known as consumer reporting agencies ("CRAs").

4.    These CRAs sell information to readily paying subscribers (i.e., retailers, landlords, lenders, potential employers, and other similar interested parties), commonly called "consumer reports," concerning individuals who may be applying for retail credit, housing, employment, or a car or mortgage loan.

5.    Since 1970, when Congress enacted the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.* ("FCRA"), federal law has required CRAs to implement and utilize reasonable procedures "to assure maximum possible accuracy" of the personal, private, and financial information that they compile and sell about individual consumers.

6.    One of the primary purposes in requiring CRAs to assure "maximum possible accuracy" of consumer information is to ensure the stability of our banking system:

> The banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system.

See 15 U.S.C. § 1681(a)(1).

7.     The preservation of one's good name and reputation is also at the heart of the FCRA's purposes:

> [W]ith the trend toward computerization of billings and the establishment of all sorts of computerized data banks, the individual is in great danger of having his life and character reduced to impersonal "blips" and key-punch holes in a stolid and unthinking machine which can literally ruin his reputation without cause, and make him unemployable or uninsurable, as well as deny him the opportunity to obtain a mortgage or buy a home. We are not nearly as much concerned over the possible mistaken turn-down of a consumer for a luxury item as we are over the possible destruction of his good name without his knowledge and without reason. Shakespeare said, the loss of one's good name is beyond price and makes one poor indeed.

*Bryant v. TRW, Inc.*, 689 F.2d 72, 79 (6th Cir. 1982) [quoting 116 Cong. Rec. 36570 (1970)] (emphasis added).

8.     The FCRA also requires CRAs to conduct a reasonable reinvestigation to determine whether information disputed by consumers is inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which the CRA receives the notice of dispute from the consumer. This mandate exists to ensure that consumer disputes are handled in a timely manner and that inaccurate information contained within a consumer's credit report is corrected and/or deleted so as to not prevent said consumer from benefiting from his or her credit and obtaining new credit.

9.     In light of these important findings and purposes, Congress specifically noted "a need to insure that [CRAs] exercise their grave responsibilities with fairness, impartiality, and respect for the consumer's right to privacy." *See* 15 U. S.C. § 1681(a)(4).

10.     The FCRA also requires furnishers of information, a creditor or other third party that provides information about consumer to a CRA, upon notice, to conduct a reasonable reinvestigation of all disputes with regard to the completeness or accuracy of any information it provides to the CRAs regarding a consumer and modify, delete, or permanently block any items of information found to be inaccurate, incomplete, or unverifiable after said reinvestigation is completed.

11.     Plaintiff's claims arise out of the Credit Bureau Defendants' blatantly inaccurate credit reporting, wherein the Credit Bureau Defendants reported to Plaintiff's potential creditors that Plaintiff had a derogatory debt collection account relating to an alleged amount owed to his previous landlord.

12.     Accordingly, Plaintiff brings claims against the Credit Bureau Defendants for failing to follow reasonable procedures to assure the maximum possible accuracy of Plaintiff's credit reports, in violation of the FCRA, 15 U.S.C. § 1681e(b), and failing to conduct a reasonable reinvestigation to determine whether information Plaintiff disputed was inaccurate and record the current status of the

disputed information, or delete the disputed information from Plaintiff's credit file, in violation of the FCRA, 15 U.S.C. § 1681i.

13.     Plaintiff also brings a claim against Defendant IQ Data International, Inc. ("IQ Data") for failing to fully and properly reinvestigate Plaintiff's disputes and review all relevant information provided by Plaintiff and the Credit Bureau Defendants, in violation of the FCRA, 15 U.S.C. § 1681s-2(b)(1).

14.     Plaintiff further brings claims against Defendant IQ Data for violations of the Fair Debt Collection Practices Act, specifically §§ 1692e(2)(A), 1692e(10), and 1692f(1), for misrepresenting the character, amount, and legal status of a debt, using false representations to collect amounts not legally owed, and attempting to collect amounts not permitted by law.

15.     As part of this action, Plaintiff seeks actual, statutory, and punitive damages, costs and attorneys' fees from Defendants for their willful and/or negligent violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq*., as described herein.

16.     As part of this action, Plaintiff seeks actual damages, statutory damages, costs and attorneys' fees from Defendant IQ Data for its violations of the Fair Debt Collection Practices Act, 15 U.S.C. § 1692, *et seq*., as described herein.

## PARTIES

17.    Thomas Keon McConnell ("Plaintiff") is a natural person residing in Atlanta, Georgia, and is a "consumer" as that term is defined in 15 U.S.C. § 1681a(c).

18.    Defendant Equifax Information Services, LLC. ("Defendant Equifax" or "Equifax") is a limited liability company with a principal place of business located at 1550 Peachtree Street, N.W., Atlanta, Georgia 30309, and is authorized to do business in the State of Georgia, including within this District. Experian can be served through its registered agent, Corporation Service Company, at 2 Sun Court, Suite 400, Peachtree Corners, Georgia 30092.

19.    Equifax is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). Equifax is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d) to third parties.

20.    Defendant Experian Information Solutions, Inc. ("Defendant Experian" or "Experian") is a corporation with a principal place of business located at 475 Anton Boulevard, Costa Mesa, California 92626, and is authorized to do business in the State of Georgia, including within this District. Experian can be served through its registered agent, C T Corporation System, at 330 North Brand Boulevard, Glendale, California 91203.

21.    Experian is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). Experian is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d), to third parties.

22.    Defendant Trans Union LLC ("Defendant Trans Union" or "Trans Union") is a limited liability company with a principal place of business located at 555 West Adams Street, Chicago, Illinois 60661, and is authorized to do business in the State of Georgia, including within this District. Trans Union can be served through its registered agent, Illinois Corporation Service Company, at 801 Adlai Stevenson Drive, Springfield, Illinois 62703.

23.    Trans Union is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). Trans Union is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d) to third parties.

24.    Defendant IQ Data International, Inc. ("IQ Data") is a collector with its headquarters at 21222 30th Drive SE, Suite C210, Bothell, Washington, 98021, and is authorized to do business in the State of Georgia, including within this District. IQ Data can be served through its registered agent, Sea Pac Engineering, Inc, at 3256 Chico Way NW STE 200, Bremerton, WA, 98312.

25.    Defendant IQ Data regularly collects or attempts to collect debts owed or due or asserted to be owed or due another, and is therefore a "debt collector" within the meaning of the FDCPA, as defined at 15 U.S.C. §1692a(6). Defendant IQ Data regularly uses the telephone and mail to engage in the business of collecting debts and/or alleged debts from consumers in several states, including Georgia.

26.    Defendant IQ Data is a debt collector and "furnisher" of consumer information, as defined in 15 U.S.C. § 1681s-2(b).

## JURISDICTION AND VENUE

27.    This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1681p, which allows claims under the FCRA to be brought in any appropriate court of competent jurisdiction.

28.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## FACTS

### Summary of the Fair Credit Reporting Act

29.    The FCRA governs the conduct of consumer reporting agencies in an effort to preserve the integrity of the consumer banking system and to protect the

rights of consumers to fairness and accuracy in the reporting of their credit information.

30.    The FCRA was designed to protect consumers from the harmful effects of inaccurate information reported in consumer reports (commonly referred to as "credit reports"). Thus, Congress enshrined the principles of "fair and accurate credit reporting" and the "need to ensure that consumer reporting agencies exercise their grave responsibilities with fairness" in the very first provision of the FCRA. *See* 15 U.S.C. § 1681(a).

31.    Specifically, the statute was intended to ensure that "consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information.  *See* 15 U.S.C. § 1681(b).

32.    To that end, the FCRA imposes the following twin duties on consumer reporting agencies: (i) consumer reporting agencies must devise and implement reasonable procedures to ensure the "maximum possible accuracy" of information contained in consumer reports (15 U.S.C. § 1681e(b)); and (ii) consumer reporting agencies must reinvestigate the facts and circumstances surrounding a consumer's dispute and timely correct any inaccuracies (15 U.S.C. § 1681i).

33.    The FCRA provides consumers with a private right of action against consumer reporting agencies that willfully or negligently fail to comply with their statutory obligations under the FCRA.

## Factual Background

34.    The United States Congress has found that the banking system is dependent upon fair and accurate credit reporting.  Inaccurate consumer reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence, which is essential to the continual functioning of the banking system.

35.    The Credit Bureau Defendants sell millions of consumer reports (often called "credit reports" or "reports") per day, and also sell credit scores.

36.    Pursuant to 15 U.S.C. § 1681e(b), consumer reporting agencies, like the Credit Bureau Defendants, are required "to follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

37.    Pursuant to 15 U.S.C. §§ 1681b and 1681e(a), consumer reporting agencies, like the Credit Bureau Defendants, must maintain reasonable procedures to assure that consumer reports are sold only for legitimate "permissible purposes."

38.    The Credit Bureau Defendants' consumer reports generally contain the following information:

    (a)   Header/Identifying Information: this section generally includes the consumer's name, current and prior addresses, date of birth, and phone numbers;

    (b)   Tradeline Information: this section pertains to consumer credit history, and includes the type of credit account, credit limit or loan amount, account balance, payment history, and status;

    (c)   Public Record Information: this section typically includes public record information, such as bankruptcy filings; and,

    (d)   Credit Inquiries: this section lists every entity that has accessed the consumer's file through a "hard inquiry" (i.e., consumer-initiated activities, such as applications for credit cards, to rent an apartment, to open a deposit account, or for other services) or "soft inquiry" (i.e., user-initiated inquiries like prescreening).

39.    The Credit Bureau Defendants obtain consumer information from various sources. Some consumer information is sent directly to the CRA by furnishers.

40.    The majority of institutions that offer financial services (e.g., banks, creditors, and lenders) rely upon consumer reports from CRAs (like the Credit Bureau Defendants) to make lending decisions.

41.    Those institutions also use FICO Scores, and other proprietary third-party algorithms (or "scoring" models), including debt-to-income ratios, to interpret the information in a consumer's consumer report, which is based on the amount of reported debt, payment history, and date of delinquencies contained in the Credit Bureau Defendants' consumer reports.

42.    The information the Credit Bureau Defendants include in a consumer report contributes to a consumer's overall creditworthiness and determines their FICO Scores.

43.    FICO Scores are calculated using information contained in the Credit Bureau Defendants' consumer reports.

44.    The Credit Bureau Defendants know that FICO and other third-party algorithms (as well as the algorithms owned by the Credit Bureau Defendants) use variables or "attributes" derived from a consumer's consumer report to calculate a "credit score," which is a direct reflection of a consumer's creditworthiness.

45.    The Credit Bureau Defendants know that lenders also consider a consumer's debt-to-income ratio (DTI) before deciding to extend credit or approve financing terms.

46.    DTI compares the total amount a consumer owes to the total amount a consumer earns.

47.    The higher the amount of reported debt that a consumer has, or appears to have, or is rather *reported* to have, the less favorable the consumer's DTI will be, and the more difficult it will be for a consumer to obtain credit and favorable credit terms. Rather, if offered credit at all, consumers will be offered less credit and at higher interest rates.

48.    The Credit Bureau Defendants routinely report inaccurate and materially misleading information about consumers like Plaintiff, without verifying or updating it as required by Section 1681e(b) of the FCRA.

49.    The Credit Bureau Defendants fail to employ reasonable procedures to assure the maximum possible accuracy of the information that they report about consumers, including but not limited to, account balances, account statuses, payment histories, and payment statuses.

50.     Consumers have filed thousands of lawsuits and FTC and Consumer Financial Protection Bureau Complaints against the Credit Bureau Defendants for their inaccurate credit reporting.

51.     Thus, the Credit Bureau Defendants are on continued notice of their respective inadequate reporting procedures.  Specifically, the Credit Bureau Defendants are on notice that their inadequate procedures regularly result in the reporting of inaccurate balances, account statuses, payment histories, and payment statuses.

52.     The Credit Bureau Defendants have received and documented many disputes from consumers complaining that Credit Bureau Defendants reported inaccurate information about them.

**Plaintiff's Tenancy with Collier Ridge Apartments Group ("Collier Ridge")**

53.     Plaintiff's tenancy term with Collier Ridge spanned from July 3, 2023, to July 2, 2024.

54.     In or around June 2024, the Plaintiff secured a suitable apartment and vacated the premises at Collier Ridge.

55.     Upon moving out, the Plaintiff received a move-out statement from Collier Ridge Apartments, dated July 2, 2024, indicating a billing period from June

1, 2024, to July 2, 2024, with a total balance of approximately $306.66, which included a $13.79 electricity charge.

56.    On or about August 13, 2024, the Plaintiff received an email notification from Collier containing a revised final move-out statement, which indicated an outstanding balance of $292.63.

57.    The August 13, 2024, email informed the Plaintiff that if the outstanding balance of $292.63, as reflected in the final move-out statement, was not paid within thirty days from the date of the email, the account would be transferred to a debt collector for further collection actions.

58.    In or around the beginning of September 2024, prior to the thirty (30) day deadline set by Collier Ridge Apartments, the Plaintiff contacted the complex to inquire about the outstanding balance, recalling that, according to the August 13, 2024, email, he had thirty days to pay the balance before the account would be transferred to a debt collector for collection.

59.    During this phone call, the Plaintiff was informed that the account had been sent to collections on or about August 29, 2024, well before the deadline Collier Ridge had previously communicated, which granted Plaintiff until September 13, 2024, to settle the outstanding balance.

60.    Upon learning of this, Plaintiff became alarmed, fearing the negative impact on his credit rating and creditworthiness. He understood the critical importance of maintaining a healthy credit record, as it was his primary means of securing financial backing in the event of an emergency or in the event of any major purchases Plaintiff sought to undertake.

61.    Plaintiff explained to the Collier Ridge representative that he had been given thirty days to pay the outstanding balance, a deadline which had not yet passed. During the August 29, 2024, phone call, the Collier Ridge representative reviewed the email and assured the Plaintiff that she would remove the outstanding balance from the debt collector to whom it had been transferred.

62.    On September 11, 2024, twenty-nine days after receiving the email notification from Collier Ridge, Plaintiff paid the outstanding balance of $292.63 in person using a Western Union money order.

63.    The Plaintiff's resident ledger confirms that the payment was applied to the account on September 12, 2024, the day following the payment—all still within the thirty-day period that Collier Ridge provided to Plaintiff to settle the account.

64.    As such, Plaintiff thought the matter was settled.

**Defendants Report that Plaintiff is Delinquent on One or More Payment Obligations**

65.     On or about October 30, 2024, Defendant IQ Data reported to the Credit Bureau Defendants that Plaintiff had a delinquent debt collection account relating to his tenancy with Collier.

66.     Specifically, on or about October 30, 2024, Plaintiff received a notification from Defendant Trans Union, communicating that his collection balance has increased, leading to a drop in his credit rating by nearly 100 points. Plaintiff was devastated, he took his credit health seriously and was concerned about any negative impact on his ability to secure financing and other forms of credit in the event of need.

67.     On the same day of October 30, 2024, Plaintiff telephoned Collier Ridge seeking to understand the meaning of this given his earlier payoff of any outstanding amount owed and Collier Ridge's representations that it would withdraw the debt from the debt collector. However, Plaintiff was unable to reach a representative.

68.     On the following day of October 31, 2024, Plaintiff visited the Collier Ridge office and was provided with another resident ledger confirming the application of his Western Union money order payment tendered to Collier Ridge to cover his balance on September 12, 2024, before the thirty-day deadline provided

by Collier Ridge in its August 13, 2024, email. The Collier Ridge representative with whom Plaintiff engaged was unable to account for these inconsistencies.

69.    On or about November 3, 2024, Plaintiff contacted Defendant IQ Data pursuant to the Collier Ridge property management company's recommendation.

70.    Plaintiff informed IQ Data that the account should not be in collections given that he had thirty days to pay off the balance as per Collier Ridge's August 13, 2024, email, which he in fact did pay off within the requisite thirty-day period. Specifically, Plaintiff explained that he tendered his payment of the outstanding balance owed to Collier Ridge, and that same was processed and applied against his account as evidenced through the resident ledger he obtained on October 31, 2024.

71.    Plaintiff notified IQ Data that it should not be attempting to collect on a transferred debt for a creditor that had already been paid in full, as no further obligation remained on Plaintiff's part.

72.    The Plaintiff provided Defendant IQ Data with more than sufficient information to notify it that the collection debt related to his Collier Ridge tenancy, which was reported on his credit files and reports, was inaccurate and uncollectible.

73.    Despite the Plaintiff's extensive dispute of the account that Defendant IQ Data claimed he owed, IQ Data insisted that the issue must be resolved with Collier Ridge Apartments—despite the fact that the Plaintiff had already settled the

debt with Collier Ridge through his September 11, 2024, payment and informed them of same. IQ Data further suggested that the Plaintiff could make a payment to it and potentially receive a refund if it was determined that the Plaintiff was correct.

74.    Pursuant to Defendant IQ Data's erroneous furnishings, the Credit Bureau Defendants reported to Plaintiff's credit file and reports that Plaintiff had a debt collection account relating to his Collier Ridge tenancy with an outstanding balance owed, despite the fact that Plaintiff already paid off this balance.

### Plaintiff's First Dispute to the Credit Bureau Defendants Regarding the Inaccurate Credit Reporting

75.    In or about early December 2024, extremely shocked, surprised, and embarrassed at the Credit Bureau Defendants' inaccurate reporting, Plaintiff disputed the IQ Data debt collection account associated with his Collier Ridge tenancy with each of the Credit Bureau Defendants.

76.    Plaintiff explained that on August 13, 2024, he received an email containing a final move-out statement from Collier Ridge showing a final account balance of $292.63. Plaintiff further explained that in the August 13, 2024, email he was informed that he had thirty days from the August 13, 2024, email to make the payment and that if it was not made within the thirty-day period it would be transferred to a debt collector for collection.

77.    Plaintiff explained how on September 11, 2024, he made the payment in person and that on September 12, 2024, the payment was applied to his resident ledger—which he enclosed with his dispute letter.

78.    To further support his dispute contentions Plaintiff also enclosed his move out statement dated August 13, 2024, and requisite documentation to confirm his identity and current address.

79.    Plaintiff stated that he no longer owed any money to Collier Ridge— given his payoff—and that any reporting indicating that he continued to owe the subject debt was a gross inaccuracy and even stigmatizing.

80.    Plaintiff requested that Defendants Equifax, Experian, and Trans Union reinvestigate the disputed information, correct the reporting, and for each to send him a corrected copy of his credit report.

### Defendant Equifax's Unreasonable Dispute Reinvestigation

81.    Defendant Equifax received Plaintiff's December 2024 dispute, on or about December 3, 2024.

82.    Upon information and belief, Equifax sent Defendant IQ Data an automated credit dispute verification ("ACDV") pursuant to Plaintiff's December 2024 dispute to Equifax.

83.    In the alternative, Defendant Equifax failed to send an ACDV forwarding Plaintiff's dispute of the inaccurate debt collection account to Defendant IQ Data. Defendant Equifax therefore violated 15 U.S.C. § 1681i(a)(2)(A)- (B) as it failed to provide notification of the dispute to the furnisher (Defendant IQ Data) who provided any item of information in dispute and further failed to include all relevant information regarding the dispute that it had received through Plaintiff's dispute.

84.    Upon information and belief, Defendant Equifax failed to adequately review all of the information provided to it by Plaintiff in support of Plaintiff's dispute.

85.    Upon information and belief, Defendant Equifax failed to conduct a reasonable reinvestigation of Plaintiff's dispute in or around early December 2024.

86.    Thereafter, Defendant Equifax failed to correct or delete the IQ Data debt collection account appearing in Plaintiff's credit file. As of January 14, 2025, Defendant Equifax continues to report that Plaintiff owes on the IQ Data debt collection account relating to his Collier tenancy, despite the extensive dispute demonstrating the falsehood of this reporting because of his timely pay off of the balance.

87.    Equifax failed to conduct a reasonable reinvestigation of Plaintiff's dispute in or around early December 2024, or any reinvestigation whatsoever, to

determine whether the disputed information is inaccurate and record the current status of the disputed information, in violation of 15 U.S.C. § 1681i(a)(1)(A).

### Defendant Experian's Unreasonable Dispute Reinvestigation

88.    Defendant Experian received Plaintiff's December 2024 dispute on or about December 5, 2024.

89.    Upon information and belief, Experian sent Defendant IQ Data an automated credit dispute verification ("ACDV") pursuant to Plaintiff's December 2025, dispute to Experian.

90.    Upon information and belief, Defendant Experian failed to adequately review all of the information provided to it by Plaintiff in support of Plaintiff's dispute.

91.    Specifically, in its reinvestigation results dated December 26, 2024, Experian represented that the dispute IQ Data debt collection account was certified as accurate to Defendant Experian and that the item of information was not changed as a result of the reinvestigation.

92.    Upon information and belief, Defendant Experian failed to conduct a reasonable reinvestigation of Plaintiff's December 2025 dispute and failed to adequately evaluate the extensive documentation that Plaintiff submitted in corroboration of his dispute contentions.

93.     Thereafter, Defendant Experian failed to correct or delete the 30-day late notation appearing in Plaintiff's credit file.

94.     Experian failed to conduct a reasonable reinvestigation of Plaintiff's dispute tendered in or about December 2024, or any reinvestigation whatsoever, to determine whether the disputed information is inaccurate and record the current status of the disputed information, in violation of 15 U.S.C. § 1681i(a)(1)(A).

**Defendant Trans Union's Unreasonable Dispute Reinvestigation**

95.     Defendant Trans Union received Plaintiff's December 2024, dispute on or about December 2, 2024.

96.     Upon information and belief, Trans Union sent Defendant IQ Data an automated credit dispute verification ("ACDV") pursuant to Plaintiff's December 2024 dispute to Trans Union.

97.     Upon information and belief, Defendant Trans Union failed to adequately review all of the information provided to it by Plaintiff in support of Plaintiff's dispute.

98.     Specifically, on or about December 27, 2024, Defendant Trans Union issued dispute reinvestigation results stating that the disputed information was verified as accurate by Defendant IQ Data.

99.    Upon information and belief, Defendant Experian failed to conduct a reasonable reinvestigation of Plaintiff's December 2025 dispute and failed to adequately evaluate the extensive documentation that Plaintiff submitted in corroboration of his dispute contentions.

100.    Thereafter, Defendant Trans Union failed to correct or delete the inaccurate IQ Data debt collection account appearing in Plaintiff's credit file.

101.    Trans Union failed to conduct a reasonable reinvestigation of Plaintiff's dispute tendered in or around December 2024, or any reinvestigation whatsoever, to determine whether the disputed information is inaccurate and record the current status of the disputed information, in violation of 15 U.S.C. § 1681i(a)(1)(A).

**The Credit Bureau Defendants' Method for Considering Consumer Credit Report Disputes**

102.    The credit industry has constructed a method of numeric-alpha codes for considering consumer credit report disputes. See 15 U.S.C. § 1681i(a)(5)(D).

103.    The credit bureaus, Equifax, Experian, Trans Union, and Innovis, have thus created the Online Solution for Complete and Accurate Reporting, or e-OSCAR, as the credit industries' standard of performance. e-OSCAR allows the credit bureaus to create and data furnishers to respond to disputes initiated by consumers by routing credit reporting agency-created prompts for automated

consumer dispute verifications to the appropriate data furnishers. e-OSCAR utilizes a numeric-alpha language specific to the credit reporting industry.

104.   That lexicon or unique language is commonly referred to in the credit reporting industry as "Metro 2 Format" or "Metro 2."

105.   It is also known industry wide as the CDIA's "Credit Reporting Resource Guide."

106.   Metro 2 is driven by numeric codes that translate into specific alpha representations about consumers' creditworthiness and character that will ultimately appear on credit reports issued to third parties who make credit, insurance, rental, and employment decisions regarding consumers.

107.   Metro 2 codes are used on an industry wide form known within the credit industry as an Automated Consumer Dispute Verification ("ACDV") electronic form.

108.   The ACDVs have many fields in their body for use in effecting thorough and complete communications between data furnishers and the credit reporting agencies.

109.   These ACDV "fields" have various titles for the many substantive areas into which the Metro 2 codes can be entered.

110.   Upon receiving a dispute from a consumer, the credit bureaus have an automated system that prepares ACDVs that are sent to each of the data furnishers that are reporting the credit accounts disputed by a consumer.

111.   The data furnishers, like Defendant IQ Data, then have an obligation under the FCRA to conduct a reasonable reinvestigation with respect to the disputed credit account and review all relevant information provided by the consumer with the dispute to determine whether the disputed credit account information is accurate and/or belongs to the disputing consumer. See 15 U.S.C. § 1681s-2(b).

112.   Once the data furnisher completes its reinvestigation, it will code the ACDV accordingly, representing either that the disputed account was verified as accurate and belonging to the disputing consumer, updating information related to the account, or deleting the account entirely, and return the ACDV to the respective credit bureau(s) via e-OSCAR.

**Defendant IQ Data's Unreasonable Dispute Reinvestigation**

113.   Upon information and belief, on or about December 3, 2024, Defendant IQ Data received Defendant Equifax's ACDV and failed to conduct a reasonable investigation with respect to the information disputed by Plaintiff.

114.    Upon information and belief, Defendant IQ Data failed to review all relevant information provided by Defendant Equifax regarding Plaintiff's dispute tendered in or about December 2024.

115.    Upon information and belief, Defendant IQ Data verified the disputed information as accurate to Defendant Equifax.

116.    In the alternative, Defendant IQ Data failed to cease the furnishing of the inaccurate debt collection account to Defendant Equifax, in violation of 15 U.S.C 1681s-2(b)(1)(D).

117.    Upon information and belief, on or about December 5, 2024, Defendant IQ Data received Defendant Experian's ACDV and failed to conduct a reasonable investigation with respect to the information disputed by Plaintiff.

118.    Upon information and belief, Defendant IQ Data failed to review all relevant information provided by Defendant Experian regarding Plaintiff's dispute tendered in or about December 2024.

119.    Upon information and belief, on or about December 5, 2024, Defendant IQ Data verified the disputed information as accurate to Defendant Experian.

120.    Upon information and belief, on or about December 2, 2024, Defendant IQ Data received Defendant Trans Union's ACDV and failed to conduct a reasonable investigation with respect to the information disputed by Plaintiff.

121.   Upon information and belief, Defendant IQ Data failed to review all relevant information provided by Defendant Trans Union regarding Plaintiff's dispute tendered in or about December 2024.

122.   Upon information and belief, on or about December 27, 2024, Defendant IQ Data verified the disputed information as accurate to Defendant Trans Union.

123.   Defendant IQ Data violated 15 U.S.C. § 1681s-2b by failing to conduct a reasonable investigation with respect to the disputed information, failing to review all relevant information available to it, and failing to modify, delete, or permanently block the disputed information that was inaccurate, incomplete or unverifiable.

124.   Plaintiff reasonably believes that Defendant IQ Data continues to furnish data to the national credit bureaus inaccurately reporting that Plaintiff owes a payment to IQ Data in relation to his Collier tenancy—despite the fact that Plaintiff paid off the debt and put Defendant IQ Data on plenary notice of same.

125.   Plaintiff reasonably believes that the Credit Bureau Defendants continue to publish that Plaintiff owes a payment to IQ Data in relation to his Collier tenancy—despite clearly informing them of the fact that this payment was made and applied to his resident ledger and therefore no longer applicable to him.

126.   As a result of the inaccurate debt collection account reporting, and despite Plaintiff's payoff of the debt before the 30-day deadline provided by Collier Ridge in its August 13, 2024, email notification and extensive disputes explicating same, the Defendants made it practically impossible for Plaintiff to continue to obtain credit at more favorable rates as the inaccurate reports caused Plaintiff's credit rating to drop by over 100 points.

127.   Specifically, upon information and belief, on or about January 28, 2025, Plaintiff submitted a credit application for a JP Morgan Chase credit card. Although Plaintiff was granted his application, Plaintiff was given an extremely high and unfavorable interest rate as a result of the Defendants' inaccurate debt collection reporting which dramatically decreased Plaintiff's credit rating and credit worthiness, upon information and belief.

128.   On or about February 10, 2025, Plaintiff submitted an application for a Capital One credit card. Although, Plaintiff was granted the credit application, Plaintiff was again given unfavorable credit terms—upon information and belief—because of the Defendants' inaccurate credit reporting containing the derogatory IQ Data debt collection account.

129.   At all times pertinent hereto, Defendants were acting by and through their agents, servants, and/or employees who were acting within the course and

scope of their agency or employment, and under the direct supervision and control of the Defendants herein.

130.  At all times pertinent hereto, the conduct of Defendants, as well as that of their respective agents, servants, and/or employees, was intentional, willful, reckless, grossly negligent and in utter disregard for federal law and the rights of Plaintiff herein.

131.  As a standard practice, the Credit Bureau Defendants do not conduct independent investigations in response to consumer disputes.  Instead, they merely parrot the response of the credit furnisher despite numerous court decisions admonishing this practice.  *See Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir. 1997) (The 'grave responsibilit[y]' imposed by § 1681i(a) must consist of something more than merely parroting information received from other sources. Therefore, a 'reinvestigation' that merely shifts the burden back to the consumer and the credit grantor cannot fulfill the obligations contemplated by the statute."); *Apodaca v. Discover Fin. Servs.*, 417 F. Supp. 2d 1220, 1230-31 (D.N.M. 2006) (noting that credit reporting agencies may not rely on automated procedures that make only superficial inquiries once the consumer has notified it that information is disputed); *Gorman v. Experian Info. Sols., Inc.*, 2008 WL 4934047, at *6 (S.D.N.Y. Nov. 19, 2008).

132.   The Credit Bureau Defendants are aware of the shortcomings of their procedures and intentionally choose not to comply with the FCRA to lower their costs. Accordingly, the Credit Bureau Defendants' violations of the FCRA are willful.

133.   As a result of Defendants' conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of ability to purchase and benefit from his good credit rating; detriment to his credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, and humiliation.

## CLAIMS FOR RELIEF
### COUNT I
### 15 U.S.C. § 1681e(b)
### Failure to Follow Reasonable Procedures to Assure Maximum Possible Accuracy
### (First Claim for Relief Against Defendants Equifax, Experian, and Trans Union)

134.   Plaintiff re-alleges and incorporates by reference the allegations set forth in preceding paragraphs as if fully stated herein.

135.    The FCRA imposes a duty on consumer reporting agencies to devise and implement procedures to ensure the "maximum possible accuracy" of consumer reports, as follows:

> Whenever a consumer reporting agency prepares a consumer report, it shall follow reasonable procedures to assure ***maximum possible accuracy*** of the information concerning the individual about whom the report relates.

15 U.S.C. §1681e(b) (emphasis added).

136.    On numerous occasions, Defendants Equifax, Experian, and Trans Union prepared patently false consumer reports concerning Plaintiff.

137.    Defendants Equifax, Experian, and Trans Union readily sold such false reports to one or more third parties, thereby misrepresenting Plaintiff, and ultimately Plaintiff's creditworthiness.

138.    Defendant Equifax violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files it published and maintained concerning Plaintiff.

139.    Defendant Experian violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files it published and maintained concerning Plaintiff.

140.   Defendant Trans Union violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files it published and maintained concerning Plaintiff.

141.   As a result of Defendants' Equifax, Experian, and Trans Union conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of ability to purchase and benefit from his good credit rating; detriment to his credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, and humiliation.

142.   Defendants Equifax, Experian, and Trans Union's conduct, actions, and inactions were willful, rendering them liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.  Alternatively, Defendants were negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

143.   Plaintiff is entitled to recover attorneys' fees and costs from Defendants Equifax, Experian, and Trans Union in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## COUNT II
## 15 U.S.C. § 1681i
## Failure to Perform a Reasonable Reinvestigation
## (Second Claim for Relief Against Defendants Equifax, Experian, and Trans Union)

144.   Plaintiff re-alleges and incorporates by reference the allegations set forth in preceding paragraphs as if fully stated herein.

145.   The FCRA mandates that a CRA conducts an investigation of the accuracy of information "[I]f the completeness or accuracy of any item of information contained in a consumer's file" is disputed by the consumer.  *See* 15 U.S.C. § 1681i(a)(1). The Act imposed a 30-day time limit for the completion of such an investigation.  *Id*.

146.   The FCRA provides that if a CRA conducts an investigation of disputed information and confirms that the information is in fact inaccurate or is unable to verify the accuracy of the disputed information, the CRA is required to delete that item of information from the consumer's file.  *See* 15 U.S.C. § 1681i(a)(5)(A).

147.   On at least one occasion within the past year year, Plaintiff disputed the inaccurate information with Equifax, Experian, and Trans Union and requested that they correct and/or delete a specific item in his credit file that is patently inaccurate, misleading, and highly damaging to him, namely, the IQ Data debt collection

account relating to his Corrier tenancy—which was clearly paid off by Plaintiff on September 11, 2024, and therefore should no longer be collected from Plaintiff.

148. In response to Plaintiff's dispute, Equifax failed to conduct a reinvestigation, or such investigation was so shoddy as to allow patently false, logically inconsistent, and damaging information to remain in Plaintiff's credit file.

149. In response to Plaintiff's dispute, Experian failed to conduct a reinvestigation, or such investigation was so shoddy as to allow patently false, logically inconsistent, and damaging information to remain in Plaintiff's credit file.

150. In response to Plaintiff's dispute, Trans Union failed to conduct a reinvestigation, or such investigation was so shoddy as to allow patently false, logically inconsistent, and damaging information to remain in Plaintiff's credit file.

151. The Credit Bureau Defendants violated 15 U.S.C. § 1681i by failing to conduct a reasonable reinvestigation to determine whether the disputed information was inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which they received the notices of dispute from Plaintiff; and by failing to maintain reasonable procedures with which to filter and verify disputed information in Plaintiff's credit file.

152.   As a result of the Credit Bureau Defendants' conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of ability to purchase and benefit from his good credit rating; detriment to his credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, and humiliation.

153.   The Credit Bureau Defendants' conduct, actions, and inactions were willful, rendering them liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. Alternatively, they were negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

154.   Plaintiff is entitled to recover attorneys' fees and costs from Defendants Equifax, Experian, and Trans Union in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## COUNT III
## 15 U.S.C. § 1681s-2(b)
## Failure to Conduct an Investigation of the Disputed Information and Review all Relevant Information Provided by the Consumer
## (Only Claim for Relief Against Defendant IQ Data)

155.   Plaintiff re-alleges and incorporates by reference the allegations set forth in preceding paragraphs as if fully stated herein.

156.   Defendant IQ Data furnished the inaccurate information relating to Plaintiff to the national credit bureaus, including but not limited to Equifax, Experian, and Trans Union.

157.   Defendant IQ Data violated 15 U.S.C. § 1681s-2(b) by failing to investigate Plaintiff's dispute, or otherwise by failing to fully and properly investigate Plaintiff's dispute(s), including but not limited to failing to review all relevant information regarding the same; by failing to permanently and lawfully correct its own internal records to prevent the re-reporting of the inaccurate information relating to Plaintiff to the national credit bureaus, including but not limited to Equifax, Experian, and Trans Union; and, by failing to cease furnishing inaccurate information relating to Plaintiff to the national credit bureaus, including but not limited to Equifax, Experian, and Trans Union.

158.   As a result of Defendant IQ Data's conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of ability to purchase and benefit

from his good credit rating; detriment to his credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, and humiliation.

159. Defendant IQ Data's conduct, action, and inaction were willful, rendering it liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. Alternatively, Defendant was negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

160. Plaintiff is entitled to recover attorneys' fees and costs from Defendant Shellpoint in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

**COUNT IV**
**FAIR DEBT COLLECTION PRACTICES ACT**
**Misrepresenting The Character, Amount, Or Legal Status of Any Debt**
**15 U.S.C. § 1692e(2)(A)**
**(Against Defendant IQ Data Only)**

161. Plaintiff incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

162. The FDCPA is a comprehensive regulatory scheme that Congress enacted to eliminate abusive, deceptive, and unfair debt collection practices by debt

collectors and to promote consistent state action to protect consumers against debt collection abuses. 15 U.S.C. §§ 1692(a), (e).

163. When Congress enacted the FDCPA in 1977, Congress had found that abusive debt collection practices harmed consumers by, among other things, increasing personal bankruptcy, marital instability, loss of employment, and invasion of privacy.

164. Defendant IQ Data falsely represented the character, amount, and legal status of Plaintiff's debt to Equifax, Experian, and TransUnion by reporting and verifying as accurate a purported debt which Plaintiff paid off on September 11, 2024, and which he was therefore no longer liable for.

165. Upon information and belief, Defendant IQ Data utilizes these false, deceptive, misleading, unfair, and unconscionable tactics as a matter of course when attempting to collect debts from consumers such as Plaintiff, despite the fact that Defendant IQ Data knew or most certainly should have known given Plaintiff's numerous notifications of same that the underlying debt with Collier was paid off within the thirty day time limit imposed on Plaintiff by Collier on or about August 13, 2024.

166. Defendant IQ Data's conduct is intentional and Defendant IQ Data did not maintain procedures reasonably adapted to avoid such conduct.

167. Defendant IQ Data violated § 1692e(2)(A) of the FDCPA by misrepresenting the legal status of the alleged debt to the Credit Bureau Defendants that Defendant IQ Data attempted to collect from Plaintiff. Defendant IQ Data's misrepresentations were made knowingly and with the intent to deceive and coerce the least sophisticated consumer.

168. Defendant IQ Data's acts as described above were done intentionally with the purpose of coercing Plaintiff to pay the alleged debt.

169. Defendant IQ Data's debt collection actions, including reporting the invalid debt collection account associated with Plaintiff's Collier tenancy to the Credit Bureau Defendants, and upon information and belief, communicating with Plaintiff about the debt to collect on same, used false, deceptive, or misleading representations or means in connection with the collection of a debt.

170. As a result of Defendant IQ Data's actions and/or inactions, Plaintiff suffered damage by loss of credit; loss of ability to purchase and benefit from his good credit rating; detriment to his credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, and humiliation.

## COUNT V
### FAIR DEBT COLLECTION PRACTICES ACT
**Use Of Any False Representation Or Deceptive Means To Collect Or Attempt
To Collect Any Debt
15 U.S.C. § 1692e(10)
(Against Defendant IQ Data Only)**

171.    Plaintiff incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

172.    Defendant IQ Data further violated the FDCPA by making false and deceptive representations that Plaintiff owed a debt that he did not legally owe to the Credit Bureau Defendants repeatedly, as discussed above.

173.    The alleged debt was in fact not legally owed because Plaintiff paid off the balance that Collier represented he owed in relation to his tenancy. Specifically, Collier sent an email to Plaintiff on August 13, 2024, representing an outstanding balance that Plaintiff owed, and imposing a deadline upon Plaintiff to pay of the subject balance within thirty days of the email date. Plaintiff paid off the balance within the requisite thirty day period on September 11, 2024. However, despite this payoff Defendant IQ Data continued to represent that Plaintiff did not make this payment by reporting that Plaintiff was obligated thereon.

174.   Defendant IQ Data's representations were made knowingly and with the intent to deceive and coerce the least sophisticated consumer in order to induce payments for alleged debt that is uncollectable as a matter of law.

175.   Defendant IQ Data's debt collection actions constituted false, deceptive, or misleading representations or means used by Defendant IQ Data in connection with the collection of a debt.

176.   As a result of Defendant IQ Data's actions and/or inactions, Plaintiff suffered damage by loss of credit; loss of ability to purchase and benefit from his good credit rating; detriment to his credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, and humiliation.

## COUNT VI
### FAIR DEBT COLLECTION PRACTICES ACT
### Collection Of A Debt Amount Unauthorized by Explicit Law or Agreement
### 15 U.S.C. § 1692f(1)
### (Against Defendant IQ Data Only)

177.   Plaintiff incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

178.    Defendant IQ Data further violated the FDCPA by using unfair or unconscionable means to collect a debt.

179.    Defendant IQ Data's unfair and unconscionable means include, without limitation:

(a)    Attempting to collect an alleged debt from Plaintiff which Plaintiff had paid off and is therefore no longer liable for renders all such debts, and collections thereof, uncollectible and invalid, pursuant to 15 U.S.C. § 1692f(1).

(b)    Attempting to coerce, pressure and/or deceive Plaintiff into paying money that he did not in fact owe.

180.    Defendant IQ Data's debt collection actions and/or inactions were false, deceptive, or misleading representations or means used in connection with the collection of an alleged debt.

181.    As a result of Defendant IQ Data's actions and/or inactions, Plaintiff suffered damage by loss of credit; loss of ability to purchase and benefit from his good credit rating; detriment to his credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting; and

emotional distress including the mental and emotional pain, anguish, and humiliation.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for the following relief:

i.   Determining that Defendants negligently and/or willfully violated the FCRA;

ii.  Awarding Plaintiff actual, statutory, and punitive damages as provided by the FCRA;

iii. Awarding Plaintiff reasonable attorneys' fees and costs as provided by the FCRA; and,

iv.  Granting further relief, in law or equity, as this Court may deem appropriate and just.

## DEMAND FOR JURY TRIAL

Plaintiff is entitled to and hereby demands a trial by jury on all issues so triable.

Dated: March 5, 2025          By: */s/ Misty Oaks Paxton*
                              Misty Oaks Paxton, Esq., Bar No. 127089
                              THE OAKS FIRM
                              3895 Brookgreen Pt.
                              Decatur, GA 30034
                              Tel: (404) 500-7861
                              Email: attyoaks@yahoo.com

                              *Attorneys for Plaintiff Thomas Keon McConnell*